### Marian Hooper v. Mary Dawson McCaffery and The Illinois T. and Sav. Bk., Executor and Trustee.

1. MARRIAGE—*Consent of the Parties.*—A valid marriage can not exist without the consent of the parties and an assumption of the marriage status. Words or actions indicative of consent by both contracting parties must exist in order to constitute the simplest kind of marriage.

2. SAME—*Subsequent Copula Will Not Supply the Lack of Consent.*—Subsequent copula will give character to words used or acts done, that in themselves are uncertain in indicating the intention of the parties to then and there marry, but will not supply a lack of consent.

3. SAME—*When it will be Presumed.*—A marriage will be presumed to exist between parties whose cohabitation is apparently matrimonial, especially where their declarations to the world are consistent with the marriage relation, and their reputation is that of being married.

4. SAME—*Counter Presumptions.*—In case of irreconcilable presumptions, both for and against marriage, one presumption will stand against the other and both will be nullified; hence, proof superior to, and which will overcome a mere presumption must be resorted to by whoever has the affirmative of the question.

5. SAME—*Living Together as Husband and Wife—When to be Held Matrimonial.*—However well it may be understood by others, that persons living together as man and wife are such, yet unless it be so understood and consented to by the parties themselves, the marriage relation between them does not exist. Sexual relationship, when in fact meretricious, and so understood by the parties, ought, in consideration for the safety of society and the repose of property, not to be held to be matrimonial.

Petition, for widow's award. Trial in the Circuit Court of Cook County on appeal from the Probate Court; the Hon. EDWARD F. DUNNE, Judge, presiding. Decree for petitioner; appeal by respondents. Heard in the Branch Appellate Court at the October term, 1898. Reversed and remanded with directions. Opinion filed May 26, 1899.

Edwin Walker, Edwin J. Farber and Pillsbury & Adams, attorneys for plaintiff in error.

Marriage will sometimes be presumed from cohabitation. But this presumption may be overcome, as cohabitation may be, and frequently is, meretricious as well as matrimonial. Laurence v. Laurence, 164 Ill. 367, 374; Myatt v. Myatt, 44 Ill. 473; Port v. Port, 70 Ill. 484; Appeal of Reading Co., 113 Pa. St. 204.

The cohabitation of two people apparently as man and wife, their reputation of being married and their declaration consistent with that relation, are nowhere held to constitute marriage; they are at most presumptive evidence of marriage. Cartwright v. McGown, 121 Ill. 388; Letters v. Cady, 10 Cal. 533; Randlett v. Rice, 141 Mass. 385; Williams v. Williams, 46 Wis. 464.

If two people live together in apparently matrimonial cohabitation, treat each other as husband and wife and acquire the reputation of being married, yet if either of them subsequently sustains similar relations with a third person, no presumption of marriage can arise from the former cohabitation and reputation, but any one asserting such a marriage must prove its actual occurrence. Bishop on Marriage and Divorce (5th Ed.), Secs. 440 and 444; Bishop on Marriage, Divorce and Separation, Vol. 1, Sec. 1034; Hiler v. People, 156 Ill. 511; George v. Thomas, 10 Up. Can. (Q. B.) 604; Jones v. Jones, 45 Md. 144, 48 Md. 391; Cartwright v. McGown, 121 Ill. 388, 406; Jackson v. Claw, 18 Johns. 345.

If two people live together in apparently matrimonial cohabitation, treat each other as husband and wife and acquire the reputation of being married, yet if either of them subsequently actually marries a third person, no presumption of marriage can arise from such cohabitation and reputation. Jones v. Jones, 45 Md. 144; Jones v. Jones, 48 Md. 391; Breakey v. Breakey, 2 Up. Can. (Q. B.) 349; Lawson on Presumptive Evidence, 447, Rule 95; Clayton v. Wardell, 5 Barb. 214, 4 N. Y. (4 Com.) 230; Taylor v. Taylor (1 Lee, 454), Eng. Eccles. Rep. 454; Case v. Case, 17

Hooper v. McCaffery.

Cal. 598; Weatherford v. Weatherford, 20 Ala. 548; Chamberlain v. Chamberlain, 71 N. Y. 423; Poultney v. Fair Haven, Bray. (Vt.) 185; Myatt v. Myatt, 44 Ill. 473.

Cohabitation arising from a void marriage, or otherwise illicitly begun, is presumed to continue illicit, and affords no evidence of marriage. Cunningham v. Cunningham, 2 Dow (House of Lords), 482; Lapsley v. Grierson, 1 H. L. C. 498; Barnum v. Barnum, 42 Md. 251; Williams v. Williams, 46 Wis. 464; Brinkley v. Brinkley, 50 N. Y. 184; Hebblethwaite v. Hepworth, 98 Ill. 126; Cartwright v. McGown, 121 Ill. 388.

E. H. Gary, H. L. Bond, Jr., and C. F. T. Beale, attorneys for defendant in error.

The declaration of a deceased husband or wife as to his or her marriage is competent, and, perhaps, almost conclusive, evidence to prove such marriage. Caujolle v. Ferrie, 23 N. Y. 104; In re Taylor, 9 Paige (N. Y.), 617; Greenwalt v. McEnelly, 85 Pa. St. 352; State v. McDonald, 25 Mo. 176; Commonwealth v. Holt, 121 Mass. 61; Bishop on Marriage, Separation and Divorce (Ed. 1891), Sec. 1058.

The declaration of a decedent of his marriage, made to his attorney, is competent evidence of such marriage. Such declaration is not a privileged communication when the client does not object to such evidence or impliedly waives the privilege; or where the inquiry is simply to ascertain, as between legatees and grantees, as to the intention of a deceased person in respect to the disposition of his estate. Scott v. Harris, 113 Ill. 454, and citation; Blackburn v. Crawfords, 3 Wall. (U. S.) 194; 1 Wharton on Evidence, Sec. 591; 1 Taylor on Evidence, Sec. 928; Russell v. Jackson, 9 Hare (Eng.), 387.

The testimony of relatives of a deceased person as to the marriage of the latter, and the general repute in the family in relation thereto, or of tacit recognition of marriage relation, is competent and primary evidence of such marriage. 1 Taylor on Evidence, Sec. 635–644; Greenleaf on Evidence, Sec. 103; Cuddy v. Brown, 78 Ill. 415; Gaines v. New

Orleans, 6 Wall. (U. S.) 642; Harland v. Eastman, 107 Ill. 538.

Evidence of repute and general reputation, living together as man and wife, holding each other out to the world as man and wife, is competent evidence of marriage. Caujolle v. Ferrie, 23 N. Y. 104; Port v. Port, 70 Ill. 485, 486; Cartwright v. McGown, 121 Ill. 398; Miller v. White, 80 Ill. 585.

Where a marriage has been shown and subsequent marriage proved, although a presumption of divorce or dissolution of the first marriage may be raised, still plenary proof is not essential to establish the contrary, and slight negative proof will overcome the presumption of divorce. Schmisseur v. Beatrie, 147 Ill. 217; Cole v. Cole, 153 Ill. 587.

Where a husband abandons his wife, or drives her from him, he is not allowed to take advantage of his acts, nor does the wife, in such case, forfeit any of her rights by subsequent wrongdoing. Gordon v. Dickison, 131 Ill. 141, and citations.

A recognized child is presumed to be legitimate, and the result of a lawful marriage. Those who question the marriage must establish the claim by irrefragible proof. Such a presumption is negatived only by disproving every reasonable possibility. Orthwein v. Thomas et al., 127 Ill. 554; Jones et al. v. Gilbert, 135 Ill. 27; Caujolle v. Ferrie, 23 N. Y. 91.

MR. JUSTICE SHEPARD delivered the opinion of the court.

John McCaffery, for many years a resident of this county, died in June, 1894, leaving a last will, disposing of a large estate, dated August 29, 1892, and a codicil thereto, dated January 6, 1894, upon which probate was made, June 14, 1894, in the Probate Court of Cook County.

Said will and codicil (duly witnessed) were as follows:

"I, John McCaffery, of the city of Chicago, in the county of Cook and State of Illinois, being of sound mind and memory, do make, ordain and establish this to be my last will and testament, hereby revoking all other wills by me heretofore made.

First.   It is my will that all my just debts and funeral expenses shall be fully paid.

Second.   I hereby constitute and appoint the Illinois Trust and Savings Bank, a corporation doing business in Chicago aforesaid, to be executor and trustee of this my last will and testament.

Third.   I hereby give, devise and bequeath to said Illinois Trust and Savings Bank aforesaid all of my estate, whether real, personal or mixed, in trust, to settle, collect, loan, invest, sell, convey by deed, improve, lease, save, accumulate, control and manage the same, in its discretion, for the best interest of my estate, and out of the income thereof to pay to my daughter, Mrs. Mary Ann Baker, the wife of Winfield S. Baker, the sum of three thousand ($3,000) dollars per annum, payable quarterly during her natural life, and if she shall have legitimate issue of her body, which shall survive her, then to continue to pay to such child or children, share and share alike, the sum of three thousand ($3,000) dollars per annum, payable quarterly from the time of my said daughter's decease until the youngest of said child or children shall come of lawful age, when said annuity shall cease.   Whereupon said trustee shall pay to said child or children the sum of forty thousand ($40,000) dollars out of my estate, to be divided share and share alike.   Said trustee shall also pay out of the income of my estate to the guardian hereinafter named, of my son, John C. McCaffery, for his use, education and support, such sum of money from time to time as may be required by said guardian, not exceeding two thousand ($2,000) dollars per annum, until he arrives at the age of twenty-one (21) years, whereupon said trustee shall pay to my said son, John C. McCaffery, the sum of forty thousand ($40,000) dollars out of my estate upon his arriving of lawful age; in addition to the foregoing annuity and bequest provided for my said son, John C. McCaffery, said trustee shall allow him the free use and occupation of the homestead now occupied by me, together with all the household goods, furniture and fixtures therein during his minority for his home, and upon his arriving of lawful age said homestead, household goods, furniture and fixtures shall become his property, in addition to said forty thousand ($40,000) dollars; my said son, John C. McCaffery, is now living with me.

 Said trustee shall also pay to my sister, Ann Brown, of the city of Chicago, the sum of one hundred ($100) dollars per annum during her natural life, payable quarterly.

Said trustee shall also pay to my friend, Thomas Kelly,

the sum of five thousand ($5,000) dollars, which sum I hereby give to him for his many kindnesses to me.

At the expiration of five (5) years from my death, said trustee shall divide so much of my estate as is not needed to pay the legacies and annuities and to carry out the terms of this will, among my lawful heirs then living, in such proportions as they would be entitled to by law as such heirs if this will were not made, provided that the child or children, nor the descendants of any such child or children of my daughter, Mary Ann Baker, nor of my sister, Ann Brown, nor said Mary Ann Baker, nor said Ann Brown, shall receive no part nor portions of my estate at such or any subsequent division thereof, aside from the annuities and legacies hereinbefore provided for them, but in determining who my lawful heirs are at such or any subsequent division of my estate, they, and each of them, shall be omitted from the list of my lawful heirs, and the said division shall be determined the same as though they never existed.

After the payment of all the legacies and after the termination of all the annuities above provided for, my trustee shall divide the balance of my estate among the same persons, or their heirs, as are permitted to participate in the first division. In making said divisions of my estate said trustee may convert my estate into money, or apportion it in kind, as my trustee may deem best.

It is my will that said executor and trustee shall have full power to sell and convey all of my real estate wherever situated, or any part thereof, at such time or times and on such terms and conditions as said trustee may deem proper.

It is my will that said trustee shall, at the expense of my estate, keep in repair and maintain the vault or mausoleum which I have lately constructed at Mount Greenwood Cemetery, in Cook county, Illinois, until the final division of my estate.

It is my will that my friend, John J. Mitchell, shall be the guardian of both the person and estate of my son, John C. McCaffery.

It is my wish that said trustee shall employ Clayton E. Crafts, who has been my attorney for several years, as the legal adviser in all matters pertaining to the settlement of my estate, and in hunting up my lawful heirs, as he is familiar therewith.

In witness whereof, I, the said John McCaffery, have hereunto set my hand and seal this 29th day of August, A. D. 1892.

JOHN McCAFFERY.  (SEAL.)

I, John McCaffery, having heretofore made my last will and testament, dated the 29th day of August, A. D. 1892, do hereby reaffirm said last will and testament in all things, and do also make, publish and declare this codicil to said last will and testament, viz.:

I do hereby declare that I had five (5) children by my first wife, whose maiden name was Dawson, being a son named William McCaffery, a daughter named Nancy McCaffery, and three (3) other daughters, whose names I do not now remember. That I had two (2) children by my second wife, whose maiden name was Douglas, being a son named Henry N. Douglas McCaffery, and a daughter whose name I do not now remember. These seven (7) children are in addition to those specifically named in said last will and testament, to which this is a codicil.

Witness my hand and seal this sixth day of January, A. D. 1894.

JOHN McCAFFERY.  (SEAL.)"

About a year after the grant of probate and letters testamentary, the defendant in error appeared in the Probate Court, and, claiming to be the widow of McCaffery, petitioned for her award as widow, her dower, and one-third of the personalty, and for distribution to her of a portion of the estate, there being, as alleged, abundant assets.

To such petition, the plaintiff in error, claiming to be the daughter of McCaffery, and one of his devisees, alone answered, denying all the alleged rights of the defendant in error, and charging that if the defendant in error were McCaffery's widow she had forfeited all claims to any part of his estate because, as charged, she voluntarily abandoned him in 1848, and lived with one William O'Daniels as his wife, from July, 1848, until his death in 1864, and thereafter claimed to be O'Daniels' lawful widow.

Upon a coming on of said petition and answer to be heard by the Probate Court, it was found that " said Mary Dawson McCaffery is the widow of said decedent, and is entitled to distribution," etc., and ordered that the executor pay her $10,000 within ten days, taking a refunding bond back. From that order an appeal was taken by the plaintiff in error to the Circuit Court, and a trial *de novo* was there had. Upon the trial in the Circuit Court, an issue of fact as to

whether the defendant in error was the lawful wife of McCaffery at the time of his death was submitted to the jury, and they returned a verdict that she was such lawful wife. There were also submitted to the jury certain special interrogatories, which, with the answers by the jury, were as follows:

"1. Did the petitioner and one William O'Daniels live together as man and wife for a period of thirteen years or more after the separation of the petitioner and the testator, John McCaffery? Yes.

2. Was an actual marriage ever celebrated between petitioner and one William O'Daniels? No.

3. Did the testator, John McCaffery, and one Marian Douglas Graham live together as man and wife and acquire a reputation of being married subsequent to the separation of the petitioner and said John McCaffery? No.

4. Was an actual marriage ceremony ever celebrated between the testator, John McCaffery, and one Nancy Ganoe or Knode? Yes.

5. Did the petitioner apply for and draw a pension from the United States government for a period of twenty-five years or more as the widow of one William O'Daniels? Yes.

6. Do you find that the testator, John McCaffery, and the petitioner ever cohabited or communicated with each other? Yes. Or had any knowledge of the residence of each other from and after their separation in or about 1848, to the date of the death of said John McCaffery in the year 1894? No."

Thereafter, the Circuit Court entered its judgment or decree, finding as was found by the Probate Court, that the defendant in error was the lawful wife of McCaffery, and approving and redirecting the order of distribution to defendant in error, as made by the Probate Court.

This appeal is from that decree of the Circuit Court.

The main issue involved, is as to whether or not the defendant in error, Mary Dawson McCaffery, is the lawful widow of said John McCaffery, or, in other words, was she his lawful wife at the time of his death.

Under the evidence, and apparently without present serious contention to the contrary, she is the same woman who is referred to in the codicil as " my first wife, whose maiden

name was Dawson;" so, also, is the plaintiff in error the daughter of the same woman referred to in the codicil as "my second wife, whose maiden name was Douglas."

The relations, upon their face matrimonial, between Mc-Caffery and the defendant in error, his "first wife," were begun in the old country about 1835, and there and in Michigan and New York State, lasted until the summer of 1848, when they absolutely ceased in New York City, and from thenceforward, until after McCaffery's death, neither one of them appears to have had any knowledge of the existence of the other. The relations between McCaffery and his "second wife"—the mother of plaintiff in error—were begun about the time of (perhaps before) his separation from his "first wife," and were, during most, if not all, of the time after the separation from defendant in error, likewise matrimonial upon their face. They certainly lived together as man and wife, and were reputed to be such, from the time they took up their residence in Alexandria, Virginia (which was soon after the separation), until her death at that place in January, 1851. A child or children were born to them, and in all other respects, while living in Alexandria, they appeared and were reputed to be man and wife. There is scarcely any evidence, except by way of inference, in the record to sustain the "third" special finding of the jury. On the other hand, the evidence is overwhelmingly opposed to it.

After the death of this "second wife," McCaffery actually married, by due ceremony, in the spring of 1852, at Hancock, Maryland, an old maid, "sixty odd years of age" (supposed to have money, which McCaffery seems not to have got), named Nancy Ganoe, with whom he lived but a very short time. One witness testified that he left on his canal boat the day after the marriage and never returned. She died about two years later, and there was no child of that marriage.

From the time when, in the spring or summer of 1852, McCaffery disappeared from the line of the Chesapeake and Ohio canal, no trace of him or his whereabouts seems

to exist in the records of this suit, until he is shown to be living in this county, prior to 1860, with a fourth "wife," Ann McKeon, or Ann McKeon McCaffery, with whom he continuously lived until her death, which occurred some five years before he died. By this last wife, his daughter, Mrs. Baker, specifically named in his will, was born. The son, John C., also specifically named in his will, is stated to be an adopted son.

From all such appearances as are ordinarily visible to the world, and by repute among their neighbors and acquaintances, McCaffery and each one of these four women during the time of their respective relationships with him, lived together as husband and wife, unless it may be that his " second wife " was the same woman that was on the boat with him in New York prior to his separation from his "first wife." By each of them, except Nancy Ganoe, he had children. One of the three children, born in Ireland, by the "first wife," defendant in error, a daughter, was left with her maternal grandmother when defendant in error came to this country to join McCaffery, about two years after he came. The other two were brought to America by the mother. Other children were born to him in this country by the "first wife," and they, together with the two brought from Ireland, were kept by McCaffery when he and his "first wife" separated. By his codicil he makes express reference to five of them. However many there were of them, they were all taken by him to Virginia and Maryland, when, shortly after he and his "first wife" separated, he went there to operate upon the Dismal Swamp and Chesapeake and Ohio Canals, and she testifies she never saw or heard of them afterward, until, at least, after his death, some forty-five years later.

The next certain identification of McCaffery, after separating from his first wife, in 1848, is in January, 1850, on the Dismal Swamp canal, bound for Norfolk, Virginia, and when he was living with his "second wife" in Alexandria, Virginia, in the apparent and reputed relationship of man and wife. By her, he certainly had the two children referred to

in his codicil, of whom the plaintiff in error is the daughter whose name he could not remember.

When, later, he disappeared from the line of the Chesapeake and Ohio canal, in 1852, shortly after marrying Nancy Ganoe, he left behind him not only his wife, Nancy, but all his living children by his two earlier wives.

In the later years of his lifetime, McCaffery made an incomplete search, through his attorney, to learn something of his abandoned children, but gave up the attempt, after partial success, and seems to have contented himself by providing in his will that his "lawful heirs" should be hunted up after his death.

Many, if not all these matters connected with McCaffery's life, are material in determining the issue involved upon this record, of whether or not defendant in error was his wife at the time of his death in 1894.

We should now briefly recur to the defendant in error and her career after separating from McCaffery, and we will speak only of what she has testified to in that respect. Their home had been for some years at Corning, New York, but McCaffery was much away on the canals. By his direction, she sold out what things they had in Corning, and with the children went to New York City on a canal boat. A quarrel there arising between McCaffery and her, he beat her, and put her ashore with her baggage, and shoved off the boat so she could not return on board. While sitting on the dock she was approached by two men, and was persuaded to accompany William O'Daniels, who seems to have worked for McCaffery on one of his canal boats, back to Geneva, on Seneca Lake—her object being to get back to Corning. Finding no boat at Geneva bound for Corning, O'Daniels left her at Geneva and went up the lake to his home. Returning, after one or two days, he represented to her that he had told his mother he was married to her, and that she might go home with him, and she went and stayed there until the next spring. It may be that the inference to be drawn from her testimony is that no improper relations existed between herself and O'Dan-

iels until spring, although he was persistent in endeavoring to obtain her consent to marry him.   When spring came, however, she began to live with him openly as his wife, and their relations, as such, continued thereafter until he died a prisoner at war, at Andersonville, October 18, 1864.   She then applied for and obtained a pension as O'Daniels' widow, in 1865, and drew it ever afterward until January, 1895.   She was never married to O'Daniels, because, as she testifies, she "did not know whether I (she) was or was not the wife of John McCaffery," but was "always known as his (O'Daniels') wife and respected as such."

In connection with her testimony concerning the obtaining of her pension as the widow of O'Daniels, she testified that she supposed McCaffery was dead before the war; and in answer to a question as to why she did not marry O'Daniels after coming to the belief that McCaffery was dead, she said :

"I didn't want to; we lived just as happily and true and loyal with each other as though we had had a hundred ceremonies performed."

But nevertheless she did, in three affidavits made by her thirty years before she testified, for securing her pension, swear specifically that she was married to O'Daniels; and gave the name of the clergyman who performed the ceremony and the date and place of its performance.   In the last one of such affidavits she is particular to specify the age of the clergyman as over seventy, his subsequent death, his absence when performing the ceremony, from the State where he resided, and that because thereof no public record of the marriage was made, and the further fact that witnesses who were present at the marriage had gone to Canada and no trace of them could be found.   And it seems that upon each of the many occasions when she subsequently received her pension, she made affidavit that she was the widow of O'Daniels.

Aside from the circumstances we have mentioned which give rise to presumptions both in favor of and against the relationship of husband and wife existing between Mc-

Caffery and the defendant in error, there is evidence which it is claimed tends to show that an actual contract of marriage was entered into between them in the old country.

Laying aside all questions of the competency of such evidence, it consisted wholly in the testimony of Mr. Crafts, the attorney who drew McCaffery's will, and the testimony of the defendant in error. The testimony of Mr. Crafts was to the effect that McCaffery told him he married Mary Dawson, or Ann Dawson, in " England or Scotland, somewhere in the old country, anyway, * * * about a year or two prior to the crowning of Queen Victoria, something prior to 1837." The same witenss also testified that McCaffery told him he was subsequently married to another woman, who was a widow, and we understand there is no dispute that the two women so referred to are respectively the defendant in error, and the mother of the plaintiff in error. It appears, also, from the testimony of Mr. Crafts, that he could not get any other information from McCaffery concerning his first wife, although he tried to do so.

Whatever weight the declarations of McCaffery in his codicil, or to Mr. Crafts, may be entitled to concerning the fact of his marriage to his "first wife," the defendant in error, exists and attaches with equal force to a marriage by him with his "second wife," the mother of plaintiff in error. He gave to Crafts substantially as much information concerning one woman as the other.

As to Mr. Crafts' testimony, assuming it to be competent evidence, it establishes nothing more conclusive upon the fact of an actual marriage, contracted with either woman, than is afforded by the statement in McCaffery's codicil concerning them, or by his continued holding out of them as his wives during the years that he lived with them respectively. In other words, it is merely cumulative evidence upon that point. It seems plain from the whole record that McCaffery's purpose in making his statements to Crafts, and by incorporating into his codicil the names of his "first" and " second " wives, was not so much, if at all, to declare and establish the fact of his marriage to either of

them, as to aid in identifying who his children were that should be the objects of his bounty. When questioned by Crafts about his first wife, McCaffery refused to give information. He had previously told his first wife's sister that she was dead. He also told his own sister that she left him and went away with somebody else. He seems also to have told Mr. Crafts that he did not want anything to do with her or her relatives, and the search that was made for his children in his lifetime was by him specifically directed to finding them, and not her.

We repeat, it seems plain that McCaffery did not intend by any declaration in his codicil or to his attorney, to represent that he ever actually entered into a marriage contract with the defendant in error, although he was interested in recognizing and claiming the children born to him by her. And we regard the record as devoid of evidence, by or through McCaffery, that there was ever a marriage contract between himself and defendant in error.

Now, as to evidence afforded by the testimony of the defendant in error, of an actual marriage ever having been celebrated between her and McCaffery. It is her testimony alone that furnishes any evidence upon the subject.

At the hearing in the Circuit Court it was admitted by counsel for defendant in error, *ipsissimis verbis :* "We do not claim that there was any legal marriage in England." And again : "There is no record of any legal marriage in England."

And, indeed, we may add it is not claimed that any record evidence of a marriage between the two anywhere exists. Whatever marriage in fact, as distinguished from marriage by presumption, was ever had between the two occurred at Gretna Green, Scotland. The only evidence upon that subject is by the defendant in error, and as shown by the abstract, is as follows :

"I was fifteen years old when I was married. * * * I lived there (in Carlisle, England) until I was married. I married John McCaffery; he was born in County Down, Ireland. 1 had known him about a year, and was married to him twice; first at Gretna Green, Scotland, without my

mother's consent. We drove from Carlisle. It took but a few hours to get there. A man named James Kelly was present. My mother was dissatisfied with the Gretna Green marriage, and insisted we should be married in the Episcopal church, but we were married in a Presbyterian church at Carlisle. * * * This was about three weeks after the first marriage, and I lived with McCaffery as his wife in the meantime."

If this last marriage, in a Presbyterian church, were ever performed, no church record in Carlisle shows it, and, as above, it is admitted that there was no legal marriage had in England. The inferences are very strong that no marriage between them took place in any church.

It will be observed that defendant in error is absolutely silent as to what took place in Gretna Green, from which she draws the conclusion that she and McCaffery were "married" there. There is nothing to show that McCaffery, by word or act, consented to marry her—and indeed, it is only by inference that we may conclude he was present with her in Gretna Green. The record, upon that point, is even less explicit than the abstract. Testifying here in a case involving a large property to her, and aided by astute counsel, she nowhere says McCaffery ever promised or consented by words or act to take her as his wife, or be married to her, or states any word or act of his to such effect.

There was plainly no ceremony performed. Kelly was the only third person present. Under the title " Gretna Green," Bouvier (Law Dict., Ed. 1897) says:

"By the law of Scotland nothing was required to constitute a marriage but the mutual declaration of the parties in the presence of witnesses—a ceremony which could be performed instantly—and it was immaterial whether or not the parties were minors."

There is no sufficient proof in this record that even so irregular a marriage as the Scottish law permitted was had. All evidence of a " mutual declaration of the parties " is lacking. To say, as defendant in error does, that she was "married to him," McCaffery, is but the statement of a conclusion either of law or of fact or both. Something more is needed under either the Scottish or the common law, to

constitute a marriage. Such a thing as a valid marriage can not exist without the consent of the parties and an assumption of the marriage status. Words or actions indicative of consent by both contracting parties to marriage then and there, must exist in order to constitute the simplest of marriages. Subsequent copula by the parties will give character to words used or acts done, that in themselves are uncertain in indicating the intention of the parties to then and there marry, but will not supply all lack of their existence.

It is not necessary to deny to the defendant in error her belief that she was married at Gretna Green, but such belief by her does not supply the lack of all evidence that McCaffery assented to the contract. His subsequent conduct does not inspire our minds with the reflection that he was too honorable to live and cohabit with her irrespective of marriage bonds; and we know of no law, recognized by our system of jurisprudence, that will permit us to hold that he entered into a marriage contract with defendant in error at Gretna Green, when, as here, there is absolutely no proof that he did so.

The case of the defendant in error must therefore fall back upon the phase of the law which will presume the state of marriage to have existed between herself and McCaffery because of their long cohabitation, etc. And here we are instantly met with the counter presumption arising from both her own and McCaffery's conduct subsequent to their separation in 1848, as already set forth.

A marriage will be presumed to exist between parties whose cohabitation is apparently matrimonial, especially where their declarations to the world are consistent with the marriage relation, and their reputation is that of being married.

But in this case there is just as much presumption of marriage between defendant in error and O'Daniels, and between McCaffery and the mother of the plaintiff in error, and between McCaffery and Ann McKeon, as ever existed between the defendant in error and McCaffery, and these

presumptions are absolutely inconsistent with each other. So, also, is the marriage ceremony that was performed between McCaffery and Nancy Ganoe absolutely inconsistent with his innocence if he were ever previously married in fact to the defendant in error and not divorced from her.

Bishop, in his work on Marriage, Divorce and Separation, Vol. 1, Sec. 1034, says of the necessity of evidence of a marriage in fact, in such a case:

"When in any issue of marriage or no marriage, the presumed innocence of a proven cohabitation is overcome or essentially weakened by the counter presumption of the innocence of some other act or transaction appearing in the case, there must be further evidence of the marriage— in other words a marriage in fact must be shown, or the proofs will be inadequate."

That is but to say, that in case of irreconcilable presumptions of both marriage and no marriage, one presumption will stand against the other and both will be nullified; hence, proof superior to, and that will overcome, mere presumption, must be resorted to, by whoever has the affirmative of the case.

The affirmative of the issue in this case, of showing that she was McCaffery's wife at the time he died, was upon the defendant in error, and if sustained, it has been because of the presumption of law arising from her relations with McCaffery, not from actual marriage to him, as distinguished from a presumptive marriage.

Now, omitting all consideration of her relations with O'Daniels and the marriage she swore to having celebrated with him, her presumptive marriage with McCaffery is met and nullified by the equally strong presumptions in favor of McCaffery's innocence in his subsequent presumed marriages to the mother of plaintiff in error, and to Ann McKeon, and by fact of his actual marriage to Nancy Ganoe.

If defendant in error had succeeded in establishing the fact of her marriage to McCaffery at Gretna Green, she would have clearly overcome all presumptions in favor of the validity of McCaffery's subsequent marriages, both presumptive and in fact, unless for a further presumption that

he procured a divorce from her after their separation, which last presumption was anticipated by the defendant in error, and perhaps overcome.

The Gretna Green marriage not being established, we see no standing in court left for the defendant in error. All presumptions of law in her favor are destroyed by the presumptions of McCaffery's innocence in the matter of his other subsequent marriages, presumed and actual.

Aside from presumptions of law, there appear in the record some facts, beyond those that have been mentioned, that oppose the theory of defendant in error that she was the lawful wife of McCaffery when they separated.

At the time of their separation, McCaffery denied to her, as she testifies, the privilege of remaining on the boat with him, and also the custody of any one of their numerous children, some of whom were quite young—she speaks of one as a baby. McCaffery was not at that time the wealthy and powerful man he subsequently became, but on the contrary he appears to have been poor—so much so that he subsequently lost his two canal boats to creditors. It would not seem that she need to have feared to legally assert herself against him, if she believed she possessed any rights as a lawful wife. She knew where McCaffery was bound for with his boats, and yet she testifies she never afterward inquired for or heard of him or the children—not even the one she left in Ireland—until after his death. It is difficult to believe she would forego all her legal rights, and suppress all the natural affections and instincts of a mother, and take up an adulterous connection, if she had then believed herself to be a lawful wife and mother.

However well it may be understood by others, that persons living together as man and wife are such, yet unless it be so understood and consented to by the parties themselves, the marriage relation between them does not and ought not to exist. Sexual relationship, when in fact meretricious, and so understood by the parties, ought, in consideration for the safety of society and the repose of property, not to be held to be matrimonial.

To hold this defendant in error to have been the lawful wife of McCaffery when he died, upon the facts disclosed by this record, is to not only violate the law, but also to set a high premium upon immorality and venality.

The peace of the family, the orderly transmission of property and the good of all society, demands that courts should be vigilant in affording all the protection which the law gives against attacks of this character, except where clear rights are made to appear.

We have avoided all secondary considerations in order to reach the main issue of fact involved in the case, and have given to the defendant in error the benefit of all questions concerning the competency of evidence. Upon the facts alone, considering everything shown by defendant in error, whether competent evidence or not, the petition of defendant in error to be declared to be the lawful widow of McCaffery, and to be entitled to share in his estate, ought not to prevail. The verdict of the jury and the findings of the Circuit Court were manifestly against both the law and the evidence, and must be set aside.

The judgment here is, that the decree or judgment of the Circuit Court be reversed and the cause remanded with directions to that court to dismiss the petition of the defendant in error.

Reversed and remanded with directions to dismiss the petition.