### Meleck Resnick v. Annie Resnick,

#### Gen. No. 12,336.

1. MARRIAGE—*what evidence competent in support of.* In a civil case evidence of the performance of a marriage ceremony in the presence of witnesses by a church official, tends to establish a marriage without proof of the exact words used in such ceremony.

2. MARRIAGE—*what overcomes presumption of validity of second.* Where the evidence of a former marriage is clear and satisfactory, it overcomes any presumption against the existence of such former marriage arising from the fact that a second marriage has actually taken place.

Separate maintenance proceeding. Appeal from the Circuit Court of Cook County; the Hon. EDWARD O. BROWN, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1905. Affirmed. Opinion filed April 10, 1906.

**Statement by the Court.** This is a bill for separate maintenance. Complainant avers that she is and has been for more than two years a resident of Cook county; that she was lawfully married to the defendant in the city of Kiev, in Russia, on or about December 15, 1886, and lived and cohabited with him as his wife until October, 1887, when the defendant wilfully deserted her and has persisted in such desertion ever since; that since said marriage, and especially since some time in 1891, defendant has been guilty of improper relations with one Mary Meyer, whom he holds out to be his wife; that defendant is a strong, healthy man, abundantly able to provide for and support complainant; that she has no property nor income of her own, is sick, unable to work and dependent entirely upon charity of friends.

Resnick v. Resnick.

She prays that he be decreed to provide for her separate maintenance and support.

The answer of defendant denies the alleged marriage with complainant, that he ever lived and cohabited with her as his wife or otherwise, that he ever deserted her, or at any time sustained improper relations with anyone. He states that December 16, 1891, he lawfully married with one Mary Meyer, with whom, as his wife, he has ever since lived and cohabited; that four children have been born to them, all of whom are now living with and being supported by him, denies that he has an income of twenty dollars a week, states that the value of his household furniture does not exceed $300, that he is working in a furniture factory for $10 a week and has no other income.

The Circuit Court found in favor of the complainant that she is his lawful wife, and decreed that defendant pay her $13 a month for her separate maintenance and allowed $75 for her counsel's fees. From that decree the defendant appeals.

MOSES, ROSENTHAL & KENNEDY, for appellant.

ISRAEL COWEN, for appellee.

MR. JUSTICE FREEMAN delivered the opinion of the court.

It is contended in appellant's behalf that there is no evidence in the record which tends to show that appellant ever agreed to take appellee as his wife or that he ever by word or act agreed to marry her; that since it is conceded appellant in 1891 married Mary Meyer, with whom he is now and has ever since been living as his wife and by whom he has four children, it became incumbent upon appellee to establish her alleged prior marriage by proof of the fact and that such proof is wanting. It is further contended that certain testimony in appellee's behalf is untrustworthy and should be disregarded.

The material question is whether there is evidence tending to support appellee's claim that she and appellant were actually married, as she contends and as the Circuit Court

finds. The evidence in appellee's behalf tends to show a remarkable state of facts. According to her own testimony appellee was a working girl eighteen or nineteen years of age when in December, 1886, she first met appellant in Kiev, Russia. She was then visiting or stopping with an aunt of his. A cousin of appellant, son of this aunt, living near by, called her into his house one day when she was passing and introduced her to appellant, telling her that appellant was or had been a soldier. A few days later, the cousin called on her and said to her, "My cousin (appellant) is a good man. You had better marry him. He is a carpenter, and he would make you a good living." Appellee states that being a poor girl, working hard for her money and having saved $150 (which she says appellant afterward took from her), being urged by appellant's cousin, who told her that she had known him (the cousin) a long time and could "believe me if I tell you he is a good man," and thinking she would have a home, finally agreed to marry appellant. The marriage took place a few days thereafter at the house of appellant's cousin, Abraham Jacobofsky. Appellee states they were married by a rabbi, whose name she believes was Waukof, in the presence of Abraham Jacobofsky, his wife and mother, people "from up-stairs," and others living, as she says, "in the yard," whom she did not know. She says that after appellant and she were married according to the Jewish law, the rabbi gave her a paper. The couple spent that night together at the cousin's house where the marriage took place, and the next night at a hotel, occupying the same room and bed. The next day, apparently, they left for Brode, on the way to America. They remained in Brode two weeks. Appellee says that about the time of or before the marriage appellant told her he had two brothers in America, Ashur Resnick and Joe Resnick. She states that on the way to Brode appellant introduced her to a travelling companion, telling the latter, "This is my wife." They stopped in Brode at the house of a Mrs. Salz. Appellant remained there with her about two weeks. Then he told her he had

not money enough to take her with him to America and would leave her there with Mrs. Salz and send for her from America. He said to Mrs. Salz, " I will leave her, and I will send for her. Lots of people lives this way, and I couldn't pay for her. I don't have enough money, and I will go to America and send for her." He showed Mrs. Salz " my marriage paper" and said, " This is my wife and I will send for her so soon as I come to America. I will send for her." Appellant left, taking with him her $150. Meanwhile she went to work doing housework or anything she could get to do, and finding it difficult to get employment, went to a place called Radvill and worked there. After waiting about six months and hearing nothing from appellant she bought a ticket and came to America, going to Philadelphia where appellant's brother Ashur Resnick lived, whose address she had obtained. Meanwhile it appears, Abraham Jacobofsky, at whose home in Kiev she had been married, had gone to Philadelphia, and appellee was taken into his home. Here, shortly after, she met appellant. She said to him, " Is that right what you have done for me? You left me and you think I not come here." She states that he did not want to talk to her, "so his cousin made him talk to me."

It is unnecessary to detail subsequent events as shown by the evidence. The couple lived together at Wilmington as husband and wife over two months. Then she says she was compelled to leave him in consequence of his ill treatment and they separated, unwillingly on her part, he telling her they would live together when they had more money, when " we will live together and maybe I will like you better, and so we will separate." Appellee says she was a strong girl, and she went to work in Philadelphia. It appears that subsequently, when told appellant was going to Chicago, she had him arrested. She met him afterward in New York and subsequently followed him to Chicago, where she found him living with the woman whom appellant now claims to be his lawful wife. It suffices to say without going into particulars that appellee has persist-

ently insisted all these years that she is appellant's lawful wife and has tried to compel him to ackowledge and treat her as such.

There is confirmatory evidence amply supporting appellee's story. The deposition of one Morris Ostrow, of Philadelphia, was taken, who states that appellant pointed out his wife to him, that they met on the train to Hamburg before coming to America; that he asked appellant "who that girl is, and he said that is my wife;" that when they reached Hamburg appellant found he did not have money enough to pay the passage of both over, and told Mrs. Resnick to stay at Hamburg and he would send for her in two or three months. The witness describes the Mrs. Resnick whom he then saw and has not seen since for fourteen years. He states that the two afterward lived together as man and wife in Philadelphia. There are discrepancies between this witness' testimony and that of appellee, who says it was at Brode and not at Hamburg that appellant left her, and in another respect. But upon careful examination these do not seem to us to throw serious doubt on the substantial truthfulness of his testimony in material matters. The witness testified according to the abstract, "Mr. Resnick told me he was married, and coming over on the ship, pointed out his wife to me. He said they were married in Kiev, Russia." This is said to be inconsistent with the rest of his testimony and with appellee's statement, since it is conceded the two did not come to America together on the ship. If, however, the punctuation is changed, the statement would read that appellant told the witness he was married and that he was coming over on the ship, and that appellant pointed out his wife, not necessarily on the ship, but as the witness elsewhere expressly says, "on the train."

Appellee is further corroborated in more important matters by the testimony of Abraham Jacobson, who in America seems to have exchanged the last two syllables of Jacobofsky, his Russian name, for the termination "son," making it Jacobson. He testifies that he has known ap-

pellant, who is his first cousin, from boyhood in Russia, that appellant and appellee were married at the witness' house in Russia and lived there as man and wife for the two days following, that there were present at the wedding the mother of the witness, his wife and others whom he don't recall, that the wedding took place in the evening and the parties were married by a Jewish rabbi. The wife of this witness also testifies to the marriage of the parties at her house in Kiev, Russia, and that they were married by a Jewish rabbi. It is urged against the testimony of these witnesses that they have apparently connected the maiden name of appellee with that of the woman whom appellant now claims as his lawful wife. Appellee's maiden name was Annie Zaravel and not, as both these witnesses seem to think, Mary Meyer. Their testimony as to this is not, however, positive, and both say it was so long ago, that they have almost forgotten about her name. This is not, we think, singular under the circumstances. There is also the testimony of an attorney who at one time prosecuted appellant in Chicago for bigamy to the effect that appellant stated he was married to appellee in Russia and divorced her in Russia, an apparent admission of the main point in controversy, the marriage in Russia. There is also other confirmatory evidence in appellee's behalf.

Appellant contents himself with denying absolutely all knowledge of appellee in Russia and that he ever married or cohabited with her anywhere at any time. His testimony is, however, contradictory and inconsistent with itself, so much so that the chancellor evidently gave it little credence, and in this view from our inspection of it in the record we cannot but concur.

By the evidence it is, we think, satisfactorily established that the parties were married by a Jewish rabbi, at Kiev in Russia, some time in the latter part of December, 1886. In addition to appellee's own testimony we have that of two eye-witnesses of the marriage whose evidence on this point is, we think, clearly entitled to credence. There was a marriage ceremony duly performed in the presence of many

witnesses by an official of the Jewish church and followed
by cohabitation.   Under such conditions it is not necessary
in a civil case to prove the exact language used in the mar-
riage ceremony.   The evidence of the ceremony is not a
mere statement of a conclusion, it is a statement of a fact
sufficiently establishing a lawful marriage, in the absence of
proof as to the law of Russia relating to marriage.   Canale
v. The People, 177 Ill. 219–223.   Appellant does not base
his defense upon any claim of ceremonial inadequacy to
constitute it a valid marriage.   He denies *in toto* that any
such ceremony was ever performed.   In this the over-
whelming preponderance of evidence is against him.   This
evidence, sufficiently providing as it does that appellant
and appellee were actually married in Russia at or about
the time and at the place as claimed by appellee, over-
comes any legal presumption which counsel urges in favor
of appellant's innocence in his subsequent relations with the
woman whom he now claims as his legal wife by reason of
a marriage ceremony performed in Chicago about Decem-
ber 16, 1891, followed by cohabitation ever since.   The case
of Hooper v. McCaffery, 83 Ill. App. 341, cited by appel-
lant's counsel is not, we think, in point.   On the contrary
there are many cases to the effect that evidence such as is
produced in appellee's behalf is competent to prove actual
marriage.   In Hiler v. The People, 156 Ill. 511, also cited
by appellant's counsel, the court say (p. 519):   " Marriage
with capacity and consent proved by direct testimony, as
by the evidence of witnesses who saw and heard the mar-
riage celebration performed between the parties, or record
evidence with identification, would be evidence of actual
marriage in fact."   In Sokel v. The People, 212 Ill. 238–
245, which was a prosecution for bigamy, the court says:
" The evidence proved a public ceremonial marriage by one
in holy orders, followed by cohabitation as husband and
wife," and this was regarded as sufficient proof of the va-
lidity of the marriage.   In Laurence v. Laurence, 164 Ill.
367–374, it is said that "it is impossible to fix a standard by
which the evidence of a marriage in every case should be

measured." In Casley v. Mitchell, 96 N. W. Rep. 725 (Iowa), it was held that "the testimony of the witness Nicholas, who married the plaintiff's sister and who was at her father's home when she and Casley returned from their marriage at the parish church, shows that they immediately afterwards commenced living together and so continued for several years and that three or four children were born to them, is alone sufficient to establish the marriage." In that case as in this, the husband deserted the wife and married again. It is to be borne in mind that, however inconsistent with his marriage to appellee was appellant's subsequent conduct in marrying Mary Meyer, there has been no such inconsistent conduct on the part of appellee. In Ellis v. Ellis, 58 Iowa, 720, it was said: "There must be something based on the acts and conduct of both parties inconsistent with the continuance of the marriage relation, before the presumption" (against a criminal act on the part of appellant) "should be indulged." See, also, Lowry v. Coster, 91 Ill. 182–184.

In reaching our conclusion that the decree of the Circuit Court must be affirmed, we are not forgetful of the consideration urged by appellant's counsel that the consequences to the mother of appellant's children, with whom he has lived for fourteen years, and to the children themselves are not pleasant to contemplate, and that a decree with such results should rest upon satisfactory and conclusive evidence. In the present case the evidence sustaining the decree is as satisfactory and as nearly conclusive as under the circumstances could be reasonably required.

The allowance of solicitors' fees is moderate, and we find no sufficient reason for disturbing the provisions of the decree in this respect nor as to the allowance for appellee, who, under the evidence, is ill and unable properly to support herself.

The decree of the Circuit Court must be affirmed.

*Affirmed.*